Filed 12/12/22  P. v. Pickett CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>ERICC PICKETT,<br><br>        Defendant and Appellant. | A164945<br><br>(Solano County<br>Super. Ct. No. VC42909) |

Defendant Ericc Pickett was charged with murder, robbery, and carjacking for his participation with a juvenile in the 1996 killing of David Iano.[1]  The special circumstance that the murder happened during a robbery was also alleged.  Pickett ultimately pleaded guilty to one count of first degree murder, and the remaining counts and enhancements were dismissed.  He was sentenced to 25 years to life in prison.

In 2019, Pickett filed a petition for relief under Penal Code former section 1170.95 (now § 1172.6).[2]  That statute was enacted as part of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which altered

---

[1] It appears that Pickett actually spells his first name "Erricc," but it is spelled as "Ericc" in official documents throughout the record.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  All further statutory references are to the Penal Code unless otherwise noted.

1

liability for felony murder. Under section 1172.6, eligible defendants may petition to have their murder convictions vacated and be resentenced.

After appointing counsel for Pickett, the trial court concluded that he had made a prima facie showing of entitlement to relief and issued an order to show cause. The court then held an evidentiary hearing at which the primary evidence was the preliminary hearing transcript, to which Pickett stipulated as the factual basis for his plea, and the testimony of a new witness. Based on this evidence, the court concluded beyond a reasonable doubt that Pickett, who the prosecution conceded was not the actual killer, was "a major participant" in the underlying felony and "acted with reckless indifference to human life" under section 189, subdivision (e)(3). Accordingly, the court denied his petition for relief.

On appeal, Pickett does not challenge the trial court's finding that he was a major participant in the underlying felony but claims that insufficient evidence supports the finding that he acted with reckless indifference to human life. We agree.[3] Thus, we reverse and remand with directions to grant the petition for resentencing.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.     *The Proceedings Leading to Pickett's Conviction for Murder*

Iano was murdered in Vallejo in September 1996. As we discuss in more detail below, evidence was presented at the preliminary hearing that Pickett, who was 21 years old at the time of the murder, wished to steal a

---

[3] As a result, we need not address Pickett's claim that the trial court's acceptance of his plea constituted an implied finding that he did not act with reckless indifference to human life, based on law governing the ability to dismiss special circumstances as a part of a plea bargain.

truck that Iano offered for sale. Iano took Pickett and Pickett's acquaintance, 17-year-old Shannon Secrease, for a test drive in the truck. An argument ensued, and Secrease shot Iano in the head while Iano was driving the vehicle. Pickett and Secrease dumped Iano, who was still breathing, on the side of the road, and Pickett was apprehended with Iano's truck two weeks later.

Based on this evidence, Pickett was charged with murder, second degree robbery, and carjacking. The information alleged a special circumstance rendering Pickett eligible for the death penalty, that the murder was committed during a robbery. It was also alleged that Pickett was armed with a firearm while committing all three crimes.[4]

In September 1997, Pickett pleaded guilty to one count of first degree murder, and the remaining counts and enhancements were dismissed. He stipulated to the preliminary hearing transcript as the factual basis for his plea. The following month, Pickett was sentenced to 25 years to life in prison and did not appeal from the judgment.[5]

---

[4] The charges were brought under sections 187, subdivision (a) (murder), 211 (robbery), and 215, subdivision (a) (carjacking). The special circumstance was alleged under section 190.2, subdivision (a)(17), and the firearm enhancements were alleged under section 12022, subdivision (a).

[5] Secrease was tried as an adult and sentenced to life without the possibility of parole after a jury convicted him of first degree murder and carjacking and found true the special circumstance that the murder was committed during a carjacking. (*People v. Secrease* (2021) 63 Cal.App.5th 231, 235, judg. vacated and cause remanded for further consideration in light of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*) and *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*).) Division Four of this court, which affirmed his convictions in 2001 (*Secrease,* at p. 235), recently reaffirmed its reversal of the trial court's denial of his petition under former section 1170.95. (*People v. Secrease* (Oct. 17, 2022, A158342) [nonpub. opn.].) The prosecution here did not seek to introduce any material from Secrease's case. Therefore, we do not consider evidence presented in that proceeding.

*B.    The Evidence Presented at the Preliminary Hearing*

Around 3:00 p.m. on September 15, 1996, Iano was found bleeding on the side of the road near the General Mills plant in Vallejo. He was still breathing when help arrived but soon passed away. The forensic pathologist who performed his autopsy testified that Iano died from a single gunshot wound, which was caused by a bullet that entered his right temple and exited the left side of his head. The shot was fired from "an intermediate range," meaning "the muzzle of the firearm was close enough" to result in "powder stippling" around the entry point.

A woman who was dating Secrease at the time testified that on the afternoon of September 15 she drove with him and Pickett to Vallejo. On the way, Secrease told her that he and Pickett "were going to get a truck." Secrease also stated, "I'm about to pull a lick," but his girlfriend testified that he was merely repeating a lyric from a song then playing on the radio.

When the group arrived in Vallejo, Secrease, who was driving his own car, parked in a Raley's parking lot across the street from Iano's house. Pickett and Secrease left on foot, and Secrease's girlfriend stayed in the car. The girlfriend testified that half an hour to 45 minutes later, Secrease returned alone, got in the car with her, "and just sped off." She did not see blood on Secrease when he returned to the parking lot, but she later noticed blood on his jacket's lining.

After leaving Vallejo, Secrease and his girlfriend went to her San Pablo home. The girlfriend testified that Secrease "called around to see where [Pickett] was," and Pickett showed up at her house within a few hours. Pickett and Secrease spoke to each other, but Secrease's girlfriend was on the phone and did not pay attention to what they said. Eventually, the two left,

4

and she saw them again only once before they were arrested. She never heard Pickett say anything about what had happened in Vallejo.

Two weeks later, on September 29, 1996, a San Pablo police officer located Iano's truck, which was reported stolen after his death. Pickett, who lived across the street from where the truck was parked, approached the officer and asked "if there was a problem with the truck because it was his." The officer told Pickett the truck was stolen and detained him. Pickett gave the officer the truck's keys and stated "that he and a friend had purchased [the] truck from a white male adult who had come by his residence . . . a few weeks earlier."

Vallejo police officers arrived and Pickett was transported to the Vallejo police department. During his initial interview, Pickett stated that on the day of the murder he was in front of his San Pablo home playing football with friends, and "a guy was driving back and forth in his truck and they struck up a conversation." According to Pickett, the man wanted to sell his truck, and "a day or two later" he returned and sold it to Pickett and "a partner."

When Pickett was interviewed again, he changed his story. He reported that on the day of the murder, he drove to Vallejo with Secrease and Secrease's girlfriend. On the way, Pickett "had [the] thought" that he and Secrease should carjack Iano, and he told Secrease, "[M]aybe we should get him for it." Pickett claimed he made the statement "jokingly," however, and he and Secrease "laughed about it."

Pickett told police that after he and Secrease left the car at the Raley's parking lot, the two went to Iano's residence and spoke to Iano about buying the truck. The three "took a short ride in the truck around the block" and returned to Iano's residence, at which point Iano said he had to take care of something and Pickett and Secrease "would have to return a little later."

5

According to Pickett, he and Secrease then went back to the Raley's parking lot, got something to eat nearby, and "returned a second time" to Iano's residence. They and Iano took "a second test drive" in Iano's truck. Pickett stated that Iano was driving, Pickett was in the middle, and Secrease was to Pickett's right.

Pickett reported that "the test drive was going fine" until they drove to "a remote area with some train tracks . . . in the General Mills area." Iano and Secrease "had some kind of a verbal argument" during which Iano used a racial slur (the n-word). To Pickett's surprise, Secrease "extended his arm across [Pickett's] body, . . . pointed a handgun at [Iano,] and shot him in the head." The "truck was still driving," so Pickett "climbed over [Iano] to take control of [it]," pulled to a stop, and "helped [Secrease] push the body out of the [truck]." He and Secrease then drove back to the Raley's parking lot. Pickett dropped Secrease off and drove Iano's truck back to San Pablo.

The truck had "some trouble" while Pickett was driving it, so he had to park it "somewhere short of reaching his residence." He told police that later that day, "he met back up with [Secrease], and they retrieved the truck" and brought it back to Pickett's residence. Then, the two "washed the truck to remove the blood."

C.    *The Proceedings on Pickett's Resentencing Petition*

Pickett filed a petition for relief under former section 1170.95 in January 2019, shortly after Senate Bill 1437 took effect. In support of the petition, Pickett alleged that he was convicted of felony murder and could no longer be convicted of that crime under amended section 189.

Later that month, the trial court appointed counsel for Pickett and directed the prosecution to file a responsive brief. The prosecution filed a brief in which it argued that Pickett was not entitled to relief because the

6

underlying facts showed he was a major participant in the underlying felony and acted with reckless indifference to human life. After Pickett submitted a reply brief, the court concluded he had made a prima facie showing of entitlement to relief and issued an order to show cause.

In November 2020, the trial court held an evidentiary hearing at which the primary evidence was the preliminary hearing transcript and a new witness's testimony. The new witness, a friend of Pickett's, testified that she was driving in Vallejo with Pickett the month before the murder when they saw a truck with a "For Sale" sign. Pickett told her "[t]hat he was going to inquire about it."

Within a week or so, Pickett and the woman spoke about the truck again. Pickett told her he wanted to steal the truck so he could remove the engine and put it in his own car. He also told her that "he needed someone dumb enough to give him a ride" to go get it and intended to take Secrease with him. Finally, the woman indicated that Pickett also said something like "he didn't want to kill the guy, however if he had to, he would." According to her, Pickett had a gun during the time period in question, although she denied "know[ing] him to carry that firearm on his person."

After Iano was murdered, the woman visited Pickett in jail. She testified that Pickett told her "that [Secrease] had panicked and reached over him and just shot the man for no reason." Pickett also said that after Iano was shot, "he was slumped over on [Pickett] and [Pickett] pushed him away, off of him." Pickett confirmed to her that he took Iano's truck and transferred its engine to his own vehicle as he had planned. Pickett also told the woman that he and Secrease subsequently gave another man Pickett's gun, but Pickett did not specify that his gun was the weapon used to kill Iano.

7

Based on the preliminary hearing transcript and the new testimony, the trial court concluded beyond a reasonable doubt that Pickett was "a major participant" in the underlying robbery and "acted with reckless indifference to human life" under amended section 189, subdivision (e)(3), meaning that he was not entitled to resentencing. The court found that the record failed to establish that Pickett's gun was used to kill Iano, that Pickett himself had or used a gun, or that he "directed [Secrease] to use the gun."[6] Nonetheless, the court determined that there was "substantial, credible evidence that at the time . . . [Pickett] initiated the plan to do the robbery, . . . he knew or should have known that it was going to result in the death [of] or injury to Mr. Iano."

Particularly convincing to the trial court was Pickett's "handling of Mr. Iano's body" after the shooting, which it found "dispositive." The court explained, "[T]he dumping of a dying man on the side of the road goes beyond reckless. It's obscene." Though "it would have been difficult for [Iano] to survive[,] . . . that opportunity to try to survive was totally denied in an insanely callous and inhumane way." Questioning whether the murder really "was a major surprise to Mr. Pickett," the court stated that "any doubt disappears in the moments thereafter in the manner in which he handles the body." It concluded that, combined with "the recklessness of getting the juvenile to assist in the crime" and "the manner in which the crime occurred," Pickett's post-murder behavior established reckless indifference to human life.

Pickett appealed the denial of his resentencing petition to this court. (*People v. Pickett*, A161446.)[7] In October 2021, shortly after the appeal

---

[6] The trial court stated some of these findings after making its original ruling denying Pickett's resentencing petition.

[7] We grant Pickett's request for judicial notice of the record in the prior appeal. (See Evid. Code, § 452, subd. (d).)

became fully briefed, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), which amended former section 1170.95, was signed into law. In response, this court remanded the matter to the trial court for it to consider whether the amendments, which took effect on January 1, 2022, altered the court's conclusion that Pickett was not entitled to relief.

On remand, the parties submitted additional briefing, but no further evidence was presented. In March 2022, after hearing argument from the parties, the trial court again denied Pickett's resentencing petition. This appeal followed.[8]

## II.
### DISCUSSION

#### A. *General Legal Standards*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] In addition to substantively amending sections 188 and 189 . . . , Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

---

[8] When this court remanded for the trial court to reconsider its ruling in light of Senate Bill 775, we stayed the original appeal. In doing so, we contemplated that if Pickett's petition was denied again, we would dissolve the stay and consider the later ruling in the original appeal. Pickett filed a new notice of appeal from the trial court's March 2022 ruling, however, so we dismissed the original appeal and allowed this appeal to be briefed. Neither party objected to this procedure.

It is uncontested that Pickett was convicted of felony murder. Murder "committed in the perpetration of, or attempt to perpetrate, . . . carjacking . . . [or] robbery . . . is murder of the first degree." (Former § 189, now § 189, subd. (a).)[9] At the time of Iano's murder, "a defendant could be found guilty of felony murder under this statute as an aider and abettor so long as [the defendant] had 'the specific intent to commit the underlying felony' and, in furtherance of that intent, committed acts from which death resulted. [Citation.] In other words, an aider and abettor of the underlying felony was held ' "strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." ' " (*In re Taylor* (2019) 34 Cal.App.5th 543, 550 (*Taylor*).)

As we explained in *Taylor*, "[u]ntil 1990, 'state law made only those felony-murder aiders and abettors who intended to kill eligible for a death sentence.' [Citation.] That year, the voters passed Proposition 115, which made eligible for death 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant,' aids and abets a specified felony, including robbery, that 'results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, . . . if a[n enumerated] special circumstance . . . has been found to be true.' "

---

[9] It is unclear from the record whether the trial court concluded the underlying felony was robbery, carjacking, or both. The distinction between these crimes does not matter for purposes of this appeal, and we will refer to the underlying felony as a robbery. In doing so, however, we express no opinion as to how the court should resentence Pickett on remand. (See § 1172.6, subd. (e) [if a petitioner is entitled to relief, "murder was charged generically, and the target offense was not charged," "[t]he petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes"].)

10

(*Taylor*, *supra*, 34 Cal.App.5th at p. 550, quoting § 190.2, subdivision (d); see § 190.2, subd. (a)(17).) "Among those special circumstances is participation in a robbery murder." (*Taylor*, at pp. 550–551, citing § 190.2, subd. (a)(17)(A).) "That a murder was committed during another felony under section 189, however, is 'insufficient of itself to establish a felony-murder special circumstance' under section 190.2[, subdivision ](d) [Citation.] Rather, a defendant who . . . 'aided and abetted the underlying felony but was not the actual killer' and did not have an intent to kill 'must aid and abet the commission of the felony "with reckless indifference to human life and as a major participant" ' for the special circumstance to be imposed." (*Taylor*, at p. 551; § 190.2, subd. (d).)

Section 190.2, subdivision (d), "was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) *Banks* and a follow-up decision, *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), "explain[ed] what it means for an aiding and abetting defendant to be a 'major participant' who acted with a 'reckless indifference to human life.' " (*In re Miller* (2017) 14 Cal.App.5th 960, 964.) Based on the conclusion that section 190, subdivision (d), " 'must be accorded the same meaning' as the principle discussed in *Tison* and *Enmund* and 'must be given the same interpretation irrespective of whether the defendant is subsequently sentenced to death or life imprisonment without parole,' " *Banks* and *Clark*

11

elucidated a number of factors to be considered in determining whether, under the totality of the circumstances, a defendant was a major participant in the underlying felony who acted with reckless indifference to human life. (*Taylor*, *supra*, 34 Cal.App.5th at pp. 551–553.)

Senate Bill 1437 amended section 189 to provide that a defendant who was not the actual killer or did not have an intent to kill is not liable for felony murder unless the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e); *Strong*, *supra*, 13 Cal.5th at p. 703.) Thus, amended section 189 uses the same standard for finding a special circumstance under section 190.2, subdivision (d), to define when such a defendant is liable for felony murder. (*Strong*, at p. 703.) In other words, only defendants who are also death eligible under section 190.2 may now be convicted of felony murder in the first place.

To pursue relief under section 1172.6, a petitioner "file[s] a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (§ 1172.6, subd. (a).) If, as here, the trial court concludes that the petition states a prima facie case for relief and issues an order to show cause, the court must then "hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty

of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid*.)

Originally, former section 1170.95 provided that at the hearing to determine the petitioner's entitlement to relief, the parties could "rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Former § 1170.95, subd. (d)(3).) Senate Bill 775 amended this provision to elaborate on the evidence that may be admitted at the hearing. Now, section 1172.6, subdivision (d)(3), provides, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the [trial] court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule."

"While the superior court acts as an independent fact finder in determining whether the People have met their burden" to establish a defendant is not entitled to resentencing under section 1172.6, "on appeal, the reviewing court applies the substantial evidence standard to the superior court's findings." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) Under this familiar standard, we ask whether the record contains "substantial

evidence . . . —i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [ruling] the existence of every fact the [court] could have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [fact finder] . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### B. *Insufficient Evidence Supports the Finding that Pickett Acted with Reckless Indifference to Human Life by Knowingly Creating a Serious Risk of Death.*

Pickett claims that the prosecution failed to carry its burden to prove beyond a reasonable doubt that he acted with reckless indifference to human life by knowingly creating a serious risk of death. We agree.

In *Banks*, the Supreme Court was primarily focused on the "major participant" element, but the decision established "the general proposition that 'felony murderers . . . who simply had awareness their confederates were armed and armed robberies carried a risk of death . . . lack the requisite reckless indifference to human life' because 'only knowingly creating a "grave risk of death" satisfies the constitutional minimum.' " (*Taylor*, *supra*, 34 Cal.App.5th at p. 557, quoting *Banks*, *supra*, 61 Cal.4th at pp. 809, 808; *Strong*, *supra*, 13 Cal.5th at p. 706.) In other words, "simple participation in . . . a 'garden-variety armed robbery' [is] not sufficient, without more," to establish the required mental state. (*Strong*, at p. 719; *Taylor*, at p. 559.)

14

*Clark* discussed the "reckless indifference to human life" element in more detail, explaining that it "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of [the defendant's] actions." (*Clark, supra,* 63 Cal.4th at pp. 616–617.) "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and [the defendant] must consciously disregard 'the significant risk of death [the defendant's] actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to [the defendant], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in [the defendant's] situation." ' . . . Notably, 'the fact a participant [in or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

As *Banks* did for the "major participant" element, *Clark* "set out a nonexhaustive list of considerations relevant to [the reckless-indifference element], including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks. [Citation.] Because the major participant and reckless indifference elements often ' "significantly overlap" ' [citation], this list of factors also overlap[s] with those . . . identified in connection with the major participation inquiry in

15

*Banks.*" (*Strong*, *supra*, 13 Cal.5th at p. 706.) Ultimately, a court must "analyze the totality of the circumstances to determine whether [a defendant] acted with reckless indifference to human life," and " ' "[n]o one of these [factors] is necessary, nor is any one of them necessarily sufficient." ' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

We begin by addressing the testimony of Pickett's female friend that Pickett said, referring to Iano, that "he didn't want to kill the guy, however if he had to, he would." Pickett's statement echoes *Clark*'s description of reckless indifference to human life as "encompass[ing] a willingness to kill (or to assist another in killing) . . . even if the defendant does not specifically desire that death as the outcome of [the defendant's] actions." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617.) But the statement, standing alone, is not substantial evidence that Pickett had the requisite mens rea, and the Attorney General does not so argue. Crucially, the prosecution conceded that Pickett was not the one to kill Iano, and as we discuss further below, there was no evidence that Pickett brought a weapon with him or knew Secrease had one. Thus, while Pickett's statement might constitute substantial evidence of reckless indifference under different circumstances, the robbery and murder that transpired do not reflect that he created a serious risk of death by taking the necessary actions to put himself or Secrease in a position to kill if they "had to." (See *Banks*, *supra*, 61 Cal.4th at p. 808.)

We turn to discuss the relevant *Clark* factors, beginning with the weapons used and the defendant's knowledge of them. (*Clark*, *supra*, 63 Cal.4th at p. 618.) The trial court specifically found there was no evidence that the gun used to kill Iano was Pickett's, that Pickett told Secrease to use the gun, or that Pickett had or used a gun that day. Nor was there evidence that Pickett supplied Secrease with the gun, that Pickett saw Secrease's gun

16

before Secrease shot it, that the two "talked beforehand about the use of a gun," or that Secrease was known to have access to guns. (*Taylor*, *supra*, 34 Cal.App.5th at p. 557.) In short, there was no evidence that Pickett was armed or knew that Secrease was. Thus, unlike in most cases addressing whether a major participant in an underlying felony acted with reckless indifference, here it is not even apparent that Pickett knowingly participated in an armed robbery. (See *Scoggins*, *supra*, 9 Cal.5th at pp. 677–678.)

The Attorney General argues that "the trial court could reasonably infer [Pickett] knew a gun was going to be used" based on the totality of the evidence. We cannot agree. Although the evidence the Attorney General identifies supports the inference that Pickett planned to steal Iano's truck, it does not support the inference that he planned an armed robbery. Secrease's singing "a song about 'doing a lick in Vallejo,' " and Pickett's statement to police that he joked with Secrease about carjacking Iano both tend to prove that a felony was planned, but they do not tend to prove an armed felony was planned. Neither do the facts that Pickett "possessed a gun during late summer 1996, and told his [female friend] that he wanted to steal Mr. Iano's truck." And nor does the evidence that Pickett never intended to pay for the truck, which the trial court relied upon in concluding that Pickett "knew or should have known that [the robbery] was going to result in [Iano's] death or injury."

We also disagree with the Attorney General that Pickett's statement to his female friend about his willingness to kill evinces his knowledge that Secrease was armed. Given the lack of evidence that Pickett knew Secrease had a gun, it is speculative to infer that because Pickett stated *he* was willing to kill to steal the truck, he planned for *Secrease* to bring a weapon to the test

17

drive. Again, our evaluation of Pickett's statement would be different if he had brought a gun to the test drive.

In addition to the lack of evidence that Pickett knew Secrease had a weapon, the record lacks other evidence supporting a conclusion that Pickett knowingly created a serious risk of death. Similar to *Banks* and *Taylor*, "nothing in the record reflects that [Pickett] knew there would be a likelihood of resistance [by Iano] and the need to meet that resistance with lethal force." (*Banks*, *supra*, 61 Cal.4th at p. 811; *Taylor*, *supra*, 34 Cal.App.5th at p. 558.) Nor was there evidence of previous criminal behavior by Secrease suggesting he was apt to act with deadly violence, another factor weighing in Pickett's favor. (See *Clark*, *supra*, 63 Cal.4th at p. 621; *Banks*, at pp. 810–811; *People v. Keel* (2022) 84 Cal.App.5th 546, 561.)

Other personal characteristics of Secrease likewise do not support the conclusion that Pickett knowingly created a serious risk of death by choosing him to participate in the robbery. Unlike the trial court and the Attorney General, we find it of little significance that Secrease was a juvenile and Pickett perceived him as "dumb enough to give [Pickett] a ride." On the day of the murder, Secrease was three days shy of his eighteenth birthday, and Pickett was only three years older. Certainly, Pickett's comment about Secrease's intelligence suggests Pickett took advantage of Secrease. But given the small age gap and Pickett's own youth, this is not a clear case of, in the trial court's words, "the elder enabler and the younger person being recruited for ill." Under these circumstances, it is not reasonable to infer that Pickett acted with reckless indifference to human life because he decided to involve Secrease instead of another adult in the robbery. (See *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [rejecting as speculative the conclusion that

18

defendant played significant role in planning robbery merely because he "was older than his confederates"].)

It is even more of a stretch to infer, as the Attorney General urges, that Pickett chose Secrease because he "wanted a partner who, like himself, would 'kill' Mr. Iano if he 'had to.' " While we accept that Secrease's youth and alleged low intelligence tend to show he was more likely to act impulsively or unpredictably, they do not support the conclusion that the robbery was more likely to turn deadly given the lack of evidence that Pickett knew or had reason to know Secrease might have a weapon or turn violent. (See *Scoggins*, *supra*, 9 Cal.5th at pp. 681–682 [where defendant planned unarmed robbery, his belief that accomplice was a " 'hot head' " did not demonstrate defendant knew lethal force was likely].)

The lack of evidence that Pickett knew Secrease had a gun influences the analysis of other *Clark* factors as well. For example, the duration of the felony is less significant because as far as Pickett knew, the danger to Iano was not heightened the longer it took to steal the truck. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620.) Here, in contrast, Iano was not subject to "a prolonged period of restraint" during which Pickett was aware he might be shot. (*Ibid.*)

There is no dispute that Pickett was physically present throughout the events leading to the murder, a key *Clark* factor. (See *Clark*, *supra*, 63 Cal.4th at p. 619.) But a defendant's presence at the scene is significant to the extent it demonstrates culpability for knowingly creating a serious risk of death, not in and of itself. (See *ibid.*; *Banks*, *supra*, 61 Cal.4th at p. 808.) For example, if "the murder is a culmination or a foreseeable result of several

19

intermediate steps, or . . . the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force[,] . . . 'it is fair to conclude that [the defendant] shared in [the] actions and mental state' " of the defendant's coparticipants. (*Clark*, at p. 619.)  Here, Pickett's presence does not suggest a culpability for knowingly creating a serious risk of death.  According to Pickett, Secrease shot Iano without warning after Iano used a racial epithet.  Under this account, the shooting was an impulsive reaction to an argument, not "the culmination of a prolonged interaction that increased the opportunity for violence." (*Taylor*, *supra*, 34 Cal.App.5th at p. 558.)

Of course, the trial court was free to, and did, discount Pickett's claim that the shooting came as "a major surprise."  But if Pickett's statements are set aside, there is no evidence whatsoever about the interactions in the truck leading up to the murder.  Thus, there is no basis on which to infer that Pickett was aware that deadly violence might transpire based on what he observed before Secrease shot Iano.

For similar reasons, we reject the Attorney General's claim that because Pickett "was in the immediate presence of the shooter and the victim," he "had the opportunity to prevent or at least minimize the risk of violence but failed to do so."  If Pickett's story is accepted, then as he sat between Iano and Secrease, Secrease extended his arm across Pickett and shot Iano once in the head.  The Attorney General claims that this put Pickett "in a position where he could have tried to prevent Secrease from shooting Mr. Iano."  It is speculative to conclude that, without any warning about what Secrease was about to do, Pickett nevertheless could have reacted quickly enough to deflect Secrease or otherwise protect Iano.  And if Pickett's claim to have been taken by surprise is rejected, there is again no evidence

20

from which to infer that he had a plausible opportunity to prevent the shooting.

Finally, we turn to Pickett's actions after the shooting, the primary evidence on which the trial court relied to conclude that Pickett acted with reckless indifference to human life. In *Taylor*, we also addressed a court's finding of reckless indifference that focused on the non-shooter defendant's actions after the murder. (*Taylor*, *supra*, 34 Cal.App.5th at p. 559.) The *Taylor* defendant was the getaway driver for a robbery during which a store employee was killed, but he did not have a weapon himself and there was little evidence he knew one of his confederates had or planned to use one. (*Id.* at pp. 547, 557–558.) There was also little evidence that the defendant had any other reason to anticipate a heightened risk of violence or had an opportunity to avert the killing. (*Id.* at pp. 558–559.) Rather, "[t]he evidence most unfavorable to [him] was of his actions *after* the shooting," as he did not attempt to help the employee after she was shot and later stated, " 'Fuck that old bitch.' " (*Id.* at pp. 559–560.)

We concluded that the *Taylor* defendant was entitled to relief, holding that although a defendant's "behavior after the murder may be relevant to whether [the defendant] acted with the requisite mind state, under *Banks* and *Clark* it is insufficient, standing alone, to constitute substantial evidence that [the defendant] acted with reckless indifference to human life." (*Taylor*, *supra*, 34 Cal.App.5th at p. 560.) We explained that "the governing standard as explained in *Banks* and *Clark* is not satisfied with evidence of a general indifference to human life, but instead with evidence of a *reckless* indifference, which is shown when the defendant knowingly *creates* a serious *risk* of death." (*Ibid.*) Thus, although callous behavior after a planned felony that results in death is relevant to establish the defendant's mind state,

21

"there must also be evidence that the defendant's participation in planning or carrying out the crime contributed to a heightened risk to human life." (*Ibid.*)

Given the dearth of evidence that Pickett knowingly participated in an armed robbery, his behavior after Iano was shot is insufficient to support the finding of reckless indifference to human life. We agree with the trial court that Pickett's dumping of Iano on the side of the road was morally abhorrent. We also acknowledge that Pickett's behavior after the shooting was worse than the *Taylor* defendant's, in that Pickett must have realized that Iano was grievously injured and nevertheless abandoned him, whereas the *Taylor* defendant was not in the victim's immediate presence and did not leave until it was clear that "help was arriving." (*Taylor*, *supra*, 34 Cal.App.5th at p. 559.) But even though Pickett exhibited indifference to human life by leaving Iano to die, that behavior does not support a reasonable inference that Pickett took any action beforehand that enhanced the risk the robbery would turn deadly.

In short, there is no basis from which to infer that Pickett planned or knowingly participated in an armed robbery, and the record lacks evidence suggesting he otherwise knowingly created a serious risk of death. Since there is insufficient evidence that he acted with reckless indifference to human life, he is entitled to relief under section 1172.6.

### III.
#### DISPOSITION

The order denying Pickett's petition for resentencing under former section 1170.95 is reversed. The matter is remanded to the trial court with instructions to grant the petition and resentence Pickett accordingly.

22

_____
Humes, P.J.

WE CONCUR:


_____
Banke, J.


_____
Devine, J. *


     *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_People v. Pickett_  A164945